**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **KEISHA THOMAS,** | § | |
| | § | |
| **Plaintiff,** | § | **SEALED** |
| | § | |
| **v.** | § | **Civil Action No. 4:10-cv-1824** |
| | § | |
| **LITTON LOAN SERVICING LP,** | § | |
| | § | |
| **Defendant.** | § | |

---

## MEMORANDUM AND ORDER

---

Pending before the Court is Defendant's Motion for Summary Judgment. (Doc. No. 16.) Having considering the parties' filings, all responses and replies thereto, and the applicable law, the Court finds that Defendant's Motion for Summary Judgment should be GRANTED.


## I. BACKGROUND[1]

This case arises out of an employment discrimination action brought by an African American woman, Keisha Thomas ("Thomas or "Plaintiff") against her previous employer, Litton Loan Servicing, LP ("Defendant or "Litton"). In 2002, Plaintiff began working at Litton as a temporary employee in the research department. (Pl.'s Resp., Doc. No. 23 at 4.) The following year, Plaintiff was hired as a regular employee. (*Id.*; Mot. at 4.) In 2007, Richard Penry, supervisor of the Program Modification Group in Litton's Loss Mitigation Department, hired Plaintiff as a Loss Mitigation Specialist Assistant.

---

[1] The facts are undisputed except where indicated.

(Mot. at 4; Penry Decl. ¶ 4.) Plaintiff and Penry interacted on a daily basis throughout 2007 and 2008. (Penry Decl. ¶ 4.) According to Penry, Plaintiff was "a steady employee, but not a top performer." (*Id.*)

Litton restructured the Loss Mitigation Department in March 2009 pursuant to new federal guidelines for processing federal mortgage modifications. (*Id.* ¶ 5; Reynolds Decl. ¶ 3.) Among other changes, Litton created new teams, including the Support Team, which Penry supervised and Plaintiff joined. (Penry Decl. ¶ 5.) The Support Team's new duties included "Mod DTI," which involved identifying and naming documents received from borrowers, and "special projects," which were changing tasks assigned by other teams. (*Id.* ¶ 6.) The Team's duties also included "Mail." (*Id.*)

Litton employees earned extra money through the payment of incentives. After the reorganization, the Support Team received the lowest incentive pay of any of Litton's new teams. (Penry Dep. 68:3-16; Martinez Dep. 201:15-17.) Martinez calculated employees' monthly incentives from an available pool of incentive pay, with each employee receiving the percentage of the pool corresponding to their contribution to the Support Team's work. (Reynolds Decl. ¶ 9.) Their contribution was calculated regardless of the type of work, and Martinez weighed each task equally. (*Id.* ¶ 9.) Thus, every task an employee in the Support Team did contributed equally to their incentive pay. (*Id.*)

Litton instituted changes to its incentive system in 2009 and 2010. In June 2009, Litton implemented a new incentive plan that applied to all Support Team members. (*Id.* ¶ 8.) This plan decreased the team's potential monthly incentive. (*Id.*) In January 2010, Litton created another incentive plan, under which employees earned incentive pay for each task based on how many of that task that could be completed in an hour. (*Id.* ¶ 10.)

2

Mod DTI was automatically distributed according to a computer program designed by Litton technology group. (Penry Decl. ¶ 7.) The program did not distribute work evenly among employees. (*Id.*) Penry sent several emails requesting that the technology group solve the problem of uneven distribution, but the group claimed that doing so was impossible. (*Id.*; Doc. No. 16, Ex. 3 to Ex. D, pp. 1-11.) Special projects were distributed "based on who would do the best job and the skill sets of those available." (Penry Decl. ¶ 8.) Penry often delegated to employee Brandi Junco the task of distributing special projects. (Junco Dep. 85:2-3.)

In May 2009, Penry and Vice President of Loss Mitigation Paul Spicker terminated two Support Team employees for falsifying their timesheets. (Penry Decl. ¶ 11.) For confidentiality reasons, Penry and Spicker did not communicate the reasons behind the termination to other Support Team members. (*Id.*) According to Defendant, Plaintiff's complaints about the Support Team's work and her work assignments increased after the terminations. (*Id.*)

In July 2009, Plaintiff told Penry that she was unhappy with how Junco treated her and dissatisfied with the work of the Support Team. (*Id.* ¶ 12; Pl.'s Resp. at 6.) After their conversation, Penry sent Plaintiff a follow-up email in which he stated that he would attempt to fix the distribution of the daily Loan ID Application. (Doc. No. 16, Ex.  8 to Ex. A, p. 2.) He explained that he would continue to distribute other duties and projects as he deemed appropriate; to that end, he was including Plaintiff in that day's special India project. (*Id.*) Penry further noted that all of Plaintiff's duties would be counted toward her monthly totals. (*Id.*) He closed by stating that he was "not allowed to discuss

personnel matters regarding other employees," but told Plaintiff to "rest assured all complaints are promptly and appropriately addressed." (*Id.*)

Plaintiff was upset by Penry's email. (Pl.'s Resp. at 7.) Misreading "personnel" as "personal," she sent Penry a reply in which she stated that it was disingenuous for him to "mischaracterize a direct request to look into an abrasive behavior by Brandi as an inquiry into her personal matters." (Doc. No. 16, Ex.  8 to Ex. A, p. 1.) She raised concerns about the hostile work environment and stated that she was being retaliated against. (Pl.'s Resp. at 7.) Her email was forwarded to human resources for handling. (*Id.*) According to Plaintiff, at this time she looked up how to report discrimination in the company handbook and contacted Ann Kelley, general counsel, to lodge a complaint. (*Id.*)

Later that month, Plaintiff complained to Martinez and others regarding the distribution of work and incentives. (Penry Decl. ¶ 13.) Penry claims that he made repeated efforts during this time to find additional special projects for Plaintiff. (*Id.* ¶ 14.)

Plaintiff applied for two positions outside of the Support Team in July 2009. (*Id.* ¶ 18-19.) Penry approved her application to transfer for both of these positions. (*Id.*) A different candidate was selected for one of the two open positions, and Plaintiff withdrew her application from consideration for the second position. (Pl.'s Resp. at 9.)

That month, Plaintiff spoke with Jennifer Osborn from the Human Resources department about her concern that work was distributed unevenly and also about the termination of the two Support Team employees. (Osborn Decl. ¶ 3.) They also discussed Plaintiff's complaint that Junco had been rude to her and Plaintiff's request to be transferred out of Penry's group. (*Id.*)

In August 2009, Penry and Martinez developed staggered work schedules, permitting four employees to begin at 7 a.m. and the rest to begin at 8 a.m. or later. (Penry Decl. ¶ 14.) They permitted employees to choose their start times based on seniority. (*Id.*) The four most senior employees selected the 7 a.m. spots, leaving Plaintiff and others to begin at 8 a.m. or later. (*Id.*)

Unbeknownst to Penry, Plaintiff met with Martinez in October 2009 to discuss work distribution and incentives. (Penry Decl. ¶ 17.) According to Martinez, Plaintiff said that she wanted additional work so that she could make better incentive pay. (Martinez Dep. 163:16-18.) Martinez told Plaintiff that her performance numbers were lower than the group's and that the staff had complained about her. (Pl.'s Resp. at 9.) After their conversation, Plaintiff sent Martinez an email in which she stated: "The fact that you would have another employee give me a portion of work to do in addition to mine—doubling my work load HAS PROMOTED a HOSTILE work environment." (Doc. No. 16, Ex. 2 to Ex. H.) She closed the email, "How much retaliation and harassment can one employee take?" (*Id.*)

Penry transferred outside of the Support Team in December. (Penry Decl. ¶ 20.) That month, he also generated performance reviews for all Support Team members, including Plaintiff. (*Id.* ¶ 21.) Penry and Martinez presented that performance review to Plaintiff in January. (*Id.*) Plaintiff received an overall rating of 2, "Partially meets Expectations"; as a consequence, she did not receive the same raise as people who received scores of 3 or higher. (Pl.'s Resp. at 10.) Due to her complaints about the low score, Plaintiff was re-reviewed in March 2010. (Penry Decl. ¶ 21; Pl.'s Resp. at 11.) Penry was not involved in her reassessment. (Penry Decl. ¶ 21.) In her revised review,

Plaintiff received an overall rating of 3 for 2009. (Pl.'s Resp. at 11.) Plaintiff and Michelle Hays, another black employee, are the only two employees that have ever been re-reviewed in this manner. (*Id.*; Spicker Dep. 88:17-25.) In her 2011 review, Thomas was given an overall score of 3, but received 2s in many categories, which she believed did not reflect her work ethic. (Pl.'s Resp. at 12.)

In April 2011, Plaintiff was fired from her job for allegedly misstating her reasons for separating from her previous employer on her employment application. (*Id.*) Only two Litton employees have ever been discharged for falsifying information on their employment applications. (Spicker Dep. 103:1-14.)

Penry claims that he did not learn that Plaintiff was alleging race discrimination until March 2010. (Penry Decl. ¶ 22.) At that time, his managers told him about Plaintiff's Equal Employment Opportunity Commission ("EEOC") charge, which she brought in January 2010. (*Id.*) They asked Penry to take a refresher course on employee relations and employee law, which Penry did. (*Id.*) They also requested that Penry have another supervisor present when taking any employee disciplinary action. (*Id.*)

Plaintiff originally filed this action in state court under the Texas Commission on Human Rights Act ("TCHRA"). Defendant removed the case to federal court pursuant to diversity jurisdiction. In her Original Petition, Plaintiff claimed that Defendant had discriminated against her because of her race and retaliated against her for opposing a discriminatory practice. (Pl's Orig. Pet., Doc. No. 1, Ex. C at 1.) Plaintiff stated that her supervisor treated her differently because she is black. Specifically, Plaintiff claimed that "[s]he was given the most menial jobs, the least amount of work for which she could earn

commissions, was unfairly reprimanded, was unfairly evaluated, and was isolated from other employees." (*Id.* at 2.)

Plaintiff further alleged that management retaliated against her when she complained about this discrimination to Human Resources. (*Id.*) As evidence of retaliation, Plaintiff pointed to the fact that Penry increased his unfair criticism of her work; Martinez reprimanded Plaintiff for things that were not true; Plaintiff was repeatedly denied promotions and transfers out of the Loss Mitigation Department; her incentive pay was greatly decreased; her incentive plan was changed to minimize her ability to make money; and Martinez attempted to double her workload. (*Id.*)

In her Response to Defendant's Motion for Summary Judgment, Plaintiff alleged that "[w]ith his white employees, Richard Penry would give them the best work, help them with their work, supervise their work, treat them with dignity and respect, help maximize their pay, and help them advance their careers at Litton." (Pl.'s Resp. at 2.) Conversely, Penry would give his black employees "the worst work, would not help them with their work, would not supervise their work, would not treat them with dignity and respect, would not help maximize their pay, and would not help them advance their careers at Litton." (*Id.*) As support for these statements, Plaintiff cited to her own affidavit. (*Id.* 5-6.)

## II. STANDARD FOR SUMMARY JUDGMENT

The party seeking summary judgment bears the burden of demonstrating that there is no actual dispute as to any material fact of the case. *Willis v. Roche Biomed. Lab.,* 61 F.3d 313, 315 (5th Cir. 1995) (citing *Celotex v. Catrett*, 477 U.S. 317, 322 (1986));

FED. R. CIV. P. 56(a). In order to survive summary judgment, Plaintiff "must raise a 'genuine issue as to a[ ] material fact' that [Defendant] discriminated against her." *Okoye v. Univ. of Tex. Houston Health Sci. Ctr.*, 245 F.3d 507, 512 (5th Cir 2001) (quoting FED. R. CIV. P. 56(c)). Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th Cir. 2011) (internal quotations omitted). This Court must view all evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Id.*

Furthermore, the summary judgment standard "provides that the mere existence of *some* factual dispute will not defeat a motion for summary judgment; Rule 56 requires that the fact dispute be *genuine* and *material*." *Willis*, 61 F.3d at 315. First, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law are material." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Second, a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (citing *Anderson*, 477 U.S. at 248).

Conclusory allegations and unsubstantiated assertions do not satisfy the non-movant's summary judgment burden. *See Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (noting that a non-movant's burden is "not satisfied with 'some metaphysical doubt as to the material facts'" (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986))); *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992) ("Mere conclusory allegations are not competent summary judgment

evidence, and they are therefore insufficient to defeat or support a motion for summary judgment."). "Nor may non-movants rest upon mere allegations made in their pleadings without setting forth specific facts establishing a genuine issue worthy of trial." *Topalian*, 954 F.2d at 1131. To meet this burden, the nonmovant must "identify specific evidence in the record and articulate the precise manner in which that evidence support[s][its] claim[s]." *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994) (internal quotation omitted).

### III. LEGAL STANDARD

The Texas Commission on Human Rights Act ("TCHRA") prohibits discriminatory employment practices based upon a person's race. TEX. LAB. CODE § 21.051. The Act provides:

> An employer commits an unlawful employment practice if because of race, color, disability, religion, sex, national origin, or age the employer:
> (1) fails or refuses to hire an individual, discharges an individual, or discriminates in any other manner against an individual in connection with compensation or the terms, conditions, or privileges of employment; or
> (2) limits, segregates, or classifies an employee or applicant for employment in a manner that would deprive or tend to deprive an individual of  any employment opportunity or adversely affect in any other manner the status of an employee.

*Id.* The TCHRA also prohibits retaliation:

> An employer, labor union, or employment agency commits an unlawful employment practice if the employer, labor union, or employment agency retaliates or discriminates against a person who, under this chapter:
> (1) opposes a discriminatory practice;
> (2) makes or files a charge;
> (3) files a complaint; or
> (4) testifies, assists, or participates in any manner in an investigation, proceeding, or hearing.

*Id.* § 2.055.

"In discrimination cases that have not been fully tried on the merits, [Texas courts] apply the burden-shifting analysis established by the United States Supreme Court" in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Wal-Mart Stores, Inc. v. Canchola*, 121 S.W.3d 735, 739 (Tex. 2003). *See also M.D. Anderson Hosp. and Tumor Inst. V. Willrich*, 28 S.W.3d 22, 23 (Tex. 2000) ("In enacting the TCHRA, the Legislature intended to correlate state law with federal law in employment discrimination cases."). Similarly, "[r]etaliation claims under the TCHRA are guided by the same analysis that applies to claims of retaliation under Title VII." *Martin v. Kroger Co.*, 65 F.Supp.2d 516, 554 (S.D. Tex 1999).

### A. Discrimination Claims

Under *McDonnell-Douglas*, "the plaintiff must first establish a prima facie case of discrimination." *Frank v. Xerox Co.*, 347 F.3d 130, 137 (5th Cir. 2003) (citation omitted). To establish a prima facie discrimination claim, Plaintiff must show that she "(1) is a member of a protected class; (2) was qualified for her position; (3) was subject to an adverse employment action; and (4) was replaced by someone outside the protected class, or, in the case of disparate treatment, … that others similarly situated were treated more favorably." *Okoye*, 245 F.3d at 513 (quotations omitted).

"Once the plaintiff presents a prima facie case, the defendant must then articulate a legitimate, nondiscriminatory reason for the questioned employment action." *Frank*, 347 F.3d at 137. "The employer bears only the burden of production at this stage." *Joseph v. City of Dallas,* No. 07-11235, 2008 WL 1976619, at *4 (5th Cir. May 6, 2008)

(citing *Patrick v. Ridge*, 394 F.3d 311, 315 (5th Cir. 2004)). "If the defendant is able to [articulate a legitimate, non-discriminatory reason], the burden shifts back to the plaintiff to produce evidence that the defendant's articulated reason is merely a pretext for discrimination." *Frank*, 347 F.3d at 137. The plaintiff bears the burden of offering sufficient evidence to create a genuine issue of material fact "(1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another motivating factor is the plaintiff's protected characteristics (mixed-motive[s] alternative)." *Berquist v. Washington Mut. Bank*, 500 F.3d 344, 356 (5th Cir. 2007) (quotation omitted). A plaintiff can prove pretext either "'[1] directly by persuading the court that a discriminatory reason more likely motivated the employer or [2] indirectly by showing that the employer's proffered explanation is unworthy of credence.'" *Amburgey v. Corhart Refractories Corp., Inc.*, 936 F.2d 805, 813 (5th Cir. 1991) (quoting *Tex. Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 256 (1981)). In the summary judgment context, however, a plaintiff need not prove pretext; a plaintiff need merely establish a genuine issue of material fact. *Id*. "Summary judgment will be improper if the plaintiff makes a prima facie case and produces sufficient evidence for a jury to *disbelieve* the employer's stated reason for discharge." *Russo v. Smith Int'l Inc.*, 93 S.W.3d 428, 438-39 (Tex.App.-Houston 2002, pet. denied) (citing *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 146-48 (2000)).

## B. Retaliation Claims

To succeed on a retaliation claim, Plaintiff must make a prima facie showing that (1) she engaged in a protected activity; (2) she was subjected to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse employment action. *Davis v. Dallas Area Rapid Transit*, 383 F.3d 309, 319 (5th Cir. 2004) (citing *Banks v. E. Baton Rouge Parish Sch. Bd.*, 320 F.3d 570, 575 (5th Cir. 2003)). "Protected activities include: (1) opposing a discriminatory practice; (2) making or filing a charge; (3) filing a complaint; or (4) testifying, assisting, or participating in any manner in an investigation, proceeding, or hearing." *Hernandez v. Grey Wolf Drilling, L.P.*, No. 04-10-00730-CV, 2011 WL 2471559, at *5 (Tex.App.-San Antonio June 22, 2011) (citations omitted); *see also* TEX. LAB. CODE ANN. § 21.055. "An adverse employment action short of discharge will support a claim for retaliation if a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Niu v. Revcor Molded Products Co.*, 206 S.W.3d 723, 731 (Tex.App.-Fort Worth 2006) (citing *Burlington Northern*, 548 U.S. at 68).

If a plaintiff succeeds in making a prima facie case, the burden shifts to the defendant to provide legitimate, non-discriminatory reasons for its conduct. *Davis*, 383 F.3d at 319. "If the defendant makes this showing, the burden shifts back to the plaintiff to demonstrate that the employer's articulated reason for the employment action was a pretext for retaliation." *Id.*

## IV. APPLICATION

Plaintiff has not established a prima facie discrimination claim. Even if she had established a prima facie case, however, Defendant has articulated legitimate, nondiscriminatory reasons for the questioned employment actions, and Plaintiff has not shown pretext or mixed motives. Thus, Plaintiff has not provided sufficient evidence to show a genuine issue as to any material fact on her discrimination claim. Plaintiff's retaliation claim also fails because she has not established a causal link between the protected activity and the alleged adverse employment actions.

As a preliminary matter, the Court notes that it will not consider the additional allegations Plaintiff raises in her Response to Defendant's Motion for Summary Judgment. (Doc. No. 23.) These allegations were not included in Plaintiff's Petition, and Defendant has not consented to these claims. *See United States ex rel. Gudur v. Deloitte Consulting LLP*, 512 F.Supp.2d 920, 956 (S.D. Tex. 2007), *aff'd,* No. 07-20414, 2008 WL 3244000 (5th Cir. Aug. 7, 2008) (stating that a party may not rely on a new claim, raised on in response to motion for summary judgment, to defeat that motion); *Goodyear Tire and Rubber Co. v. Mayes*, 236 S.W.3d 754, 755 n.1 (Tex. 2007); *Roark v. Stallworth Oil & Gas, Inc.*, 813 S.W.2d 492, 495 (Tex. 1991) (stating that parties may try an issue by consent in summary judgment proceedings); *Pathak v. Harris County Hosp. Dist.*, No. 14-08-00020-CV, 2009 WL 972552, at *2 (Tex.App.-Houston March 24, 2009) (holding that trial court did not err in granting summary judgment on unpleaded claims included in response to motion to summary judgment because they were not tried by consent).

The Court further observes that many of these new allegations are outside of the scope of Plaintiff's EEOC complaint and any investigation that would have resulted from the complaint. *Santi v. University of Texas Health Science Center at Houston*, 312

S.W.3d 800, 805 (Tex.App.-Houston 2009) ("A lawsuit under the Act is limited to claims made in the charge or complaint filed with the EEOC or the Commission and factually related claims that can reasonably be expected to grow out of the commission's investigation." (citing *Bartosh v. Sam Houston State Univ.*, 259 S.W.3d 317, 321 (Tex.App.-Texarkana 2008, pet. denied))). For example, the reorganization into new teams occurred prior to July 9, 2009, the date when Plaintiff alleged the discrimination began in her EEOC complaint. (Doc. No. 17-4, Ex. 44 to Ex. A.) Accordingly, Plaintiff cannot raise her allegations about disparate treatment between teams in this lawsuit. *See O'Neal v. Roadway Exp.*, 181 Fed.Appx. 417, 419 (5th Cir. 2006) ("O'Neal never filed an EEOC charge regarding the incidents alleged in the district court complaint dating prior to the incidents alleged in the EEOC charge. Therefore, they were not ripe for review by the district court."). For these reasons, the Court will limit its examination to the claims in Plaintiff's Original Petition.

### A. Discrimination Claim

There is no dispute that Plaintiff is a member of a protected class and was qualified for her position. (Mot. at 13.) With the exception of Defendant's failure to provide her with enough work to make incentives, however, the events Plaintiff complains of do not amount to adverse employment actions. Plaintiff has also not shown that she was treated less favorably than similarly situated employees, as required under the four-prong prima facie test. *See Okoye*, 245 F.3d at 513. Further, Defendant has articulated legitimate, nondiscriminatory reasons for its actions. *Id.* Once Defendant articulates reasons, Plaintiff bears the burden of showing that there is a genuine issue of

material fact as to whether Defendant's reason is pretextual, or whether Defendant was partially motivated by race. *Berquist*, 500 F.3d at 356. Plaintiff has failed to meet this burden. For these reasons, Plaintiff's discrimination claim fails.

i. Adverse Employment Action:

For an employment action to be adverse, it must be an "ultimate employment decision." *Washington v. Veneman*, 109 Fed.Appx. 685, 689 (5th Cir. 2004). "Ultimate employment decisions include hiring, granting leave, discharging, promoting, and compensating." *Id.* (citing *Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 707 (5th Cir. 1997), *abrogated on other grounds by Burlington Northern*, 548 U.S. at 53). *See also Ptomey v. Texas Tech University*, 277 S.W.3d 487, 492 (Tex.App.-Amarillo 2009) (applying the ultimate employment decision analysis to a TCHRA discrimination case); *Watkins v. Paulsen*, No. 08-20408, 2009 WL 1657054, at *2 (5th Cir. June 15, 2009) ("Without an objective showing of a loss in compensation, duties, or benefits, there is no adverse employment action.").

With the exception of Defendant's alleged failure to provide her with enough work from which to make incentives, the events Plaintiff complains of do not qualify as ultimate employment actions. Plaintiff alleges in her Petition that she was "given the most menial jobs, the least amount of work for which she could earn commissions, was unfairly reprimanded, was unfairly evaluated, and was isolated from other employees." (Pl.'s Orig. Pet. at 7.) The Fifth Circuit has held that "[u]ndesirable work assignments are not adverse employment actions." *Southard v. Texas Bd. of Criminal Justice*, 114 F.3d 539, 555 (5th Cir. 1997). Thus assignment of menial jobs does not rise to the standard of

adverse employment actions. Nor do reprimands, even unfair ones, qualify as adverse employment actions. *See Green v. Administrators of Tulane Educational Fund*, 284 F.3d 642, 657-58 (5th Cir. 2002) ("[T]aking disciplinary actions in the form of reprimands[] do not constitute ultimate employment decisions." (*abrogated on other grounds by Burlington Northern*, 548 U.S. at 58)). Further, Plaintiff has not "present[ed] any evidence that these 'reprimands' were anything more than mere criticisms," and criticism does not constitute an adverse employment action. *Benningfield v. City of Houston*, 157 F.3d 369, 377 (5th Cir. 1998) (citing *Harrington v. Harris*, 118 F.3d 359, 366 (5th Cir.1997)). Undeserved performance ratings also do not rise to the level of adverse employment actions. *See Washington*, 109 Fed.Appx. at 689 (noting that "undeserved poor performance ratings" do not constitute ultimate adverse employment actions under Fifth Circuit jurisprudence); *Thompson v. Exxon Mobil Corp.*, 344 F.Supp.2d 971, 981 (E.D. Tex. 2004) ("[N]egative performance evaluations, even if undeserved, are not adverse employment actions."); *Haygood v. Peters*, No. 02-60203, 2002 WL 31415362, at *1 (5th Cir. Oct. 16, 2002) ("[A] poor performance evaluation, reprimand, or other such action that has a mere tangential effect on a possible future ultimate employment decision is not actionable." (internal quotation omitted)); *Watkins v. Paulsen*, No. 0-20408, 2009 WL 1657054, at *2 (5th Cir. June 15, 2009) (finding that a poor performance review, "standing alone, plainly does not satisfy the ultimate-employment-decision test," especially when the plaintiff had failed to bring evidence "other than her own conclusory assertions—to show that any ultimate employment decisions flowed from it"). Isolation from other employees also does not qualify as an adverse employment action. *See Wooten v. St. Francis Med. Ctr.*, 108 Fed.Appx. 888, 890-91 (5th Cir. 2004)

(finding that assignment to a less desirable office did not constitute an adverse employment action); *Hamlett v. Gonzales*, No. Civ.A. 303CV2202BHM, 2005 WL 1500819, at *15 (N.D. Tex. June 15, 2005).

The only exception is Plaintiff's allegation that she was given the least amount of work from which she could earn incentives. An employer's decisions do qualify as adverse employment actions if the impact "rise[s] above having mere tangential effect on a possible future ultimate employment decision." *Mattern*, 104 F.3d at 708. "To hold otherwise would be to expand the definition of 'adverse employment action' to include events such as disciplinary filings, supervisor's reprimands, and even poor performance by the employee—anything which *might* jeopardize employment in the future." *Id.* Plaintiff does mention that her performance rating prevented her from earning a raise. However, she later received a re-evaluation in which she received a retroactive pay increase; thus the poor rating did not ultimately have an effect on her compensation. In contrast to her performance rating, Plaintiff shows that her failure to receive enough work did have an impact on her compensation. Plaintiff explains that "[w]ith the incentive system Litton has in place, it is detrimental to employees if they do not get a fair amount of work," and clarifies that "[i]ncentive pay can amount to thousands of dollars a month." (Pl.'s Resp. at 19.) The action would have had more than a tangential effect on her future employment; it would have resulted in an immediate decrease in compensation. Thus Defendant's alleged failure to give Plaintiff a fair amount of work rises to the level of an ultimate employment action. As the Court will explain below, however, Plaintiff does not meet the remaining requirements for establishing a prima facie claim or rebutting Defendant's legitimate, non-discriminatory reasons.

<u>ii. Similarly Situated Employees Who Were Treated Differently Based on
Race:</u>

Defendant alleges that Plaintiff has also failed to demonstrate that she was treated differently than similarly situated employees. "Employees are similarly situated if their circumstances are comparable in all material respects, including similar standards, supervisors, and conduct." *Ysleta Indep. School Dist. v. Monarrez*, 177 S.W.3d 915, 917 (Tex. 2005) (footnotes and citations omitted). *See also Wyvill v. United Companies Life Ins. Co.*, 212 F.3d 296, 304 (5th Cir. 2000) (stating that disparate treatment must be shown by "nearly identical" circumstances); *Lee v. Kansas City Southern Ry. Co.*, 574 F.3d 253, 259-60 (5th Cir. 2009) ("Employees with different supervisors, who work for different divisions of a company or who were the subject of adverse employment actions too remote in time from that taken against the plaintiff generally will not be deemed similarly situated. Likewise, employees who have different work responsibilities or who are subjected to adverse employment action for dissimilar violations are not similarly situated." (footnotes omitted)).  Plaintiff has not introduced sufficient evidence that other Litton employees were both similarly situated to her and treated differently.

Plaintiff states that Junco was similarly situated to her. However, Junco was a specialist, while Plaintiff was a specialist *assistant*. (Mot. at 16.) Given the difference in their positions, Junco was not similarly situated to Plaintiff. In her Response, Plaintiff also states that Jill Sissom, a white employee, received extra credit and thus higher incentives. (Pl.'s Resp. at 15.) However, Sissom did not work on the Support Team. (Mot. at 16.) In her interrogatories, Plaintiff further mentions two people who held

positions different from hers, and individuals who were transferred to different teams. (*Id.*; Mot. at 16.) Plaintiff also names Linda Koronka as a similarly situated employee. Koronka, however, worked on special loans, which was a unique function that no one else on the team performed. (Def.'s Reply at 4-5.) All of these employees had "different supervisors," "work[ed] for different divisions" of the company, or had "different work responsibilities." *Lee*, 574 F.3d at 259-60. Thus they were not similarly situated to Plaintiff.

### iii. Legitimate, Non-Discriminatory Reasons:

Even if Plaintiff had successfully offered a prima facie case, Defendant provides legitimate, non-discriminatory reasons for its conduct. Defendant gave Plaintiff menial jobs because the amount of mail increased during 2009, requiring assistants to work mail on a regular basis. (Mot. at 17.) Plaintiff's incentives depended on the percentage of work she contributed each month compared to others on the team. (Mot. at 15.) That in turn depended on the assignment of work and the efficiency and work ethic of Plaintiff and her colleagues. (Mot. at 15.) Plaintiff received the lowest incentive pay of the assistants in July 2009 because she was absent for 6 out of 22 workdays, meaning that she contributed less work overall. (*Id.* at 13.) Yet Plaintiff earned the highest incentive pay of the assistants in September 2009 and was among the highest incentive earners in December 2009. (*Id.* at 13.) Plaintiff asked for additional work in October 2009 so that she could earn more incentives; when she complained about the additional work, her work was redistributed. (*Id.* at 8-9.) According to Defendant, then, if Plaintiff received less work at all, it was because she objected to the additional work or was absent for an

unusual number of work days. Further, as she repeatedly earned high incentives, she did not necessarily receive an insufficient amount of work.

To explain the poor performance review, Defendant points out that Plaintiff did not improve in the problem areas laid out in her 2009 review. (*Id.* at 17.) Plaintiff had also repeatedly expressed dissatisfaction with the Support Team and its work. (*Id.*) As for unfair reprimands, Defendant explains that Martinez spoke with Plaintiff based on feedback Martinez had received about Plaintiff's behavior. (*Id.* at 22.) These qualify as legitimate, non-discriminatory reasons for providing Plaintiff with a poor performance evaluation and for reprimanding Plaintiff.

Defendant has not laid out its reasons for isolating Plaintiff from other employees, as she alleges in her Petition. (Pl.'s Orig. Pet. at 2.) Plaintiff has not explained what she means by isolation from other employees, however; nor did she present any evidence that she was in fact isolated. Without further details, Defendant could not be expected to provide legitimate, non-discriminatory reasons for the alleged isolation.

### iv. Pretext or Mixed Motives:

When a defendant offers a legitimate, non-discriminatory reason for its conduct, the burden shifts to the Plaintiff to show that the defendant's explanations are pretextual or that race was a motivating factor. *Berquist*, 500 F.3d at 356 (In the Fifth Circuit, a plaintiff can rebut a defendant's stated reason by presenting evidence "(1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another motivating factor is the plaintiff's protected characteristics

(mixed-motive[s] alternative).”). “A plaintiff may establish pretext either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or unworthy of credence. An explanation is false or unworthy of credence if it is not the real reason for the adverse employment action.” *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003) (internal quotation and citation omitted). “On summary judgment, in this third step, the plaintiff must substantiate his claim of pretext through evidence demonstrating that discrimination lay at the heart of the employer's decision.” *Price v. Federal Exp. Corp.*, 283 F.3d 715, 720 (5th Cir. 2002).

As examples of pretext, Plaintiff points to the fact that Litton

> can not, and does not explain why all of the black people were left behind on the support team, why the support team got the worst jobs and incentives (Hays 38/2, Penry 94/21, 103/2), why the few remaining white employees on the support team were treated better (Martinez 22/20, 28/21), why a white employee could ask to be placed on the support team while no other employees were given a choice (Martinez 200/9), why white employees got extra credit and could control their own incentive pay under Richard Penry (Junco 76/5, 79/20, 91/18, Hays 180/18), why four black employees complained about disparate treatment under Richard Penry while no white employees complained (Martinez 35/11, 46/22), and why Richard Penry was allowed to continue this disparate treatment after his boss went to him and told him to distribute the work evenly (Martinez 23/2, 24/18. 42/6).

(Pl.'s Resp. at 16.) In her Petition, Plaintiff does not allege that the reorganization of the teams was discriminatory (Pl.'s Orig. Pet. at 2); thus her statements about the reorganization and prejudice against the Support Team are not relevant here. Plaintiff's other allegations are not evidenced in the record. Martinez did not state that white employees on the support team were treated better. (Martinez Dep. 22:20-23:1, 28:21-5.) Although Martinez does admit that a white employee asked to be placed on the support

team, she does not suggest that other employees were unable to request teams. (Martinez Dep. 200:17-23.) Junco claimed that she assigned special projects, but she did not state that only white employees received extra credit or could control their own incentive pay. (Junco Dep. 76:5-23, 79:20-80:1, 91:20-3.) In fact, Junco mentioned that she wanted to distribute incentives fairly, and explained that the incentive plans for all Support Team employees were the same. (*Id.* 80:4-23.) Michelle Hays did not state in her testimony that white employees received extra credit to the exclusion of non-white employees. (Hays Dep. 180:18-21.) Although four employees complained about Penry, only two of them were black. (Martinez Dep. 48:1-5.) The two remaining employees were terminated for falsifying their time sheets. (*Id.* 48:24-5; Spicker Decl. ¶ 5.) Further, these employees did not specifically complain of disparate treatment. (Martinez 47:1-17.) Although Martinez requested that Penry distribute work evenly, she did not imply that she believed the disparate treatment was racially motivated. (*Id.* 22:20-23:12; 42:6-14.)

Plaintiff cannot meet her burden by offering allegations that are not supported by the record. The evidence Plaintiff cites does not create a genuine issue of material fact as to whether her "employer's proffered explanation is false or unworthy of credence." *Laxton*, 333 F.3d at 578. Nor is there sufficient evidence for a reasonable jury to find that "discrimination lay at the heart of the employer's decision." *Price*, 283 F.3d at 720. Thus Plaintiff has not provided sufficient evidence of pretext or mixed motives to rebut Defendant's legitimate, non-discriminatory reasons for its actions.

<u>v. Conclusion:</u>

Plaintiff has not succeeded in establishing a prima facie claim. First, she does not demonstrate that similarly situated employees were treated differently from her. Second, with the exception of Defendant's alleged failure to provide her with sufficient tasks from which to earn incentives, Plaintiff has not shown that she was the victim of adverse employment actions. Third, Defendant provides legitimate, non-discriminatory reasons for its conduct. Although Defendant does not provide a reason for isolating Plaintiff from other employees, Plaintiff failed to explain what she meant by this statement or provide any evidence of isolation. Thus Defendant could not be expected to offer reasons on this point. Finally, Plaintiff fails to put forth evidence to create a genuine issue of material fact as to whether Defendant's alleged actions were pretextual or based on mixed motives. For all of these reasons, Plaintiff has not shown a genuine issue of material fact as to her discrimination claim. Therefore, Defendant's Motion for Summary Judgment on Plaintiff's discrimination claim must be granted.

### B. Retaliation Claim

To state a claim for retaliation, Plaintiff must show that "(1) she engaged in a protected activity; (2) she was subjected to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse employment action." *Davis*, 383 F.3d at 319. "Protected activities include: (1) opposing a discriminatory practice; (2) making or filing a charge; (3) filing a complaint; or (4) testifying, assisting, or participating in any manner in an investigation, proceeding, or hearing." *Hernandez*, 2011 WL 2471559, at *5 (citations omitted); *see also* TEX. LAB. CODE ANN. § 21.055. Plaintiff states that she complained about the discrimination against her to Human

Resources, Martinez, Reynolds, and CEO Larry Litton. (Pl.'s Orig. Pet. at 2.) She alleges that rather than end the discrimination, management retaliated against her by increasing unfair criticism of her work; reprimanding her; denying her promotions and transfers out of the Loss Mitigation Department; decreasing her incentive pay; changing her incentive plan to minimize her ability to make money; and doubling her workload. (*Id.*)

Defendant states that Plaintiff has not presented sufficient evidence to create a genuine issue of material fact as to her retaliation claim. (Mot. at 19.) Specifically, Defendant points out that Plaintiff did not inform Defendant that she believed the treatment against her was racially motivated until January 20, 2010, *after* the conduct she complains of occurred. (*Id.*) Plaintiff does not provide evidence to the contrary. (Pl.'s Resp. at 17-19.) Rather, she states that her general allegations of discrimination and retaliation amounted to protected activity under the TCHRA. (*Id.* at 19.)

To engage in protected activity, Plaintiff must have informed her employer that she believed its conduct was racially motivated. *See Harris-Childs v. Medco Health Solutions Inc.*, 169 Fed.Appx. 913, 916 (5th Cir. 2006) ("Although her deposition demonstrates she complained of unfair treatment … [Plaintiff] has not demonstrated that she put the employer on notice that her complaint was based on racial or sexual discrimination."); *Arora v. Starwood Hotels & Resorts Worldwide, Inc.*, 294 Fed.Appx. 159, 162 (5th Cir. 2008) ("While ungainly, the complained about behavior does not involve an employee being treated unfairly due to race or sex, thus the complaints are not protected activity."); *Spinks v. Trugreen Landcare, LLC*, 322 F.Supp.2d 784, 796 (S.D. Tex. 2004) ("Engaging in a protected activity requires complaining of some sort of discrimination that is covered by the TCHRA."). Plaintiff's "vague charge[s] of

discrimination" did not put Defendant on notice that Plaintiff felt she was being racially discriminated against, and are not protected by the TCHRA. *Spinks*, 322 F.Supp.2d at 796. As Plaintiff only complained of racial discrimination upon the filing of her EEOC Charge in January 2010, Defendant's alleged behavior is not retaliatory under TCHRA.

Plaintiff has not shown a causal connection between the alleged discriminatory conduct she suffered and her protected activity. As a consequence, Defendant's Motion for Summary Judgment on Plaintiff's retaliation claim must be granted.


## V. CONCLUSION

For the above reasons, Defendant's Motion for Summary Judgment is hereby **GRANTED.**

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas, on this the 27th day of September, 2011.


**KEITH P. ELLISON**
**UNITED STATES DISTRICT JUDGE**